COMMERCIAL SECURITIES CO. v. REA et al.

No. 9999.

Court of Civil Appeals of Texas. Galveston.

Oct. 29, 1934.

Rehearing Denied Jan. 10, 1935.

Jas. P. Markham, Jr., W. F. Tarver, and T. J. Stovall, all of Houston, for plaintiff in error.

Chas. B. Spiner and Quinton Wright, both of Houston, for defendant in error Bracewell.

Phil D. Woodruff, of Houston, for defendant in error Rea.

PLEASANTS, Chief Justice.

This suit was brought by plaintiff in error against defendants in error, G. M. Rea and J. S. Bracewell, to recover upon an alleged contract for sale by defendant Rea of a number of notes and accounts secured by mortgages upon personal property, which notes and accounts were indorsed and assigned and their payment guaranteed by defendant Rea. The defendant Bracewell was also sued as guarantor of the notes and accounts; his alleged liability, however, being limited to $1,000. The whole amount claimed by plaintiff against the defendant Rea is $2,500.

The petition alleges in substance: That plaintiff, a corporation, was on April 14, 1929, and for some time prior thereto and until the time of this suit, engaged in the purchase of notes, contracts, accounts, and other obligations secured by chattel mortgage upon personal property, and that during all of said time down to a very recent date the defendant Rea was engaged in the business of selling radio sets, appliances, and equipment used in connection with the operation of radios, and in such business received from his customers notes, accounts, and other obligations secured by chattel mortgage upon the merchandise sold by him. The defendant conducted his business under the name and style of "Harrisburg Radio Sales and Service."

That on or about the 13th day of August, 1929, the defendant Rea, as owner of the business above designated, entered into a written contract with plaintiff, which contains the following agreement:

"1. The Dealer from time to time will tender to the Credit Company for purchase such accounts as the Dealer may see fit. Within ten days after each such tender the Credit Company shall notify the Dealer whether it will purchase any and if so which of the accounts so tendered. As to any such accounts which the Credit Company shall so purchase it shall forthwith pay the Dealer the purchase price for such accounts as mutually agreed upon between the Credit Company and the Dealer.

"2. Upon any such purchase being made the Dealer shall in such manner as the Credit Company may from time to time require effectually assign and transfer to the Credit Company title to such purchased accounts and all right, title and interest of the Dealer in and to any security given therefor and in and to the merchandise out of which such accounts arose, and shall execute all such instruments of assignment for that purpose as may be requested by the Credit Company, but whether or not any such formal instruments of assignment be executed the payment by the Credit Company to the Dealer for any such accounts, shall, ipso facto, amount to such assignment by the Dealer to the Credit Company. The Dealer will from time to time make such entries on the Dealer's books of account as may be necessary to indicate thereon the fact that any accounts purchased by the Credit Company have been assigned and belong to the Credit Company and in the event that such entries are not made by the Dealer the Credit Company may make such entries.

"3. The Credit Company shall have full power and authority to collect all of such purchased accounts, and if payment of any such purchased account shall be made to the Dealer such payment shall be and remain the property of the Credit Company and the Dealer shall forthwith turn over such payment to the Credit Company. Or, if so requested by the Credit Company, the undersigned Dealer further agrees hereby to act as agent of said Credit Company for the collection of the accounts purchased by the Credit Company, for such time as the Credit Company may desire, and without cost to the Credit Company, agreeing to collect the same promptly, to remit the proceeds collected, or dispose of same at the times and in the manner directed by the Credit Company, and to keep and hold all collections on said accounts separate and apart from monies and credits of the undersigned Dealer. Dealer further agrees that he will make prompt payment to the Credit Company of the full unpaid bal-

ance of any account covering goods returned, rejected or repossessed, and/or of any allowance or credit upon any account sold to the Credit Company. The Credit Company may at any time at its option appoint an agent or representative who may keep his office at the Dealer's place of business for the purpose of seeing that the provisions of this paragraph are in all respects carried out, and the Credit Company shall from time to time have the right to inspect the books and accounts of the Dealer and to verify by mail, or otherwise, such accounts. The Credit Company, or any agent or representative selected by it shall also have the right in the name of the Dealer to endorse any and all remittances, in whatsoever form, which may be received in respect of any such purchase accounts.

"4. The Dealer hereby unconditionally guarantees the prompt and full payment of the principal of and interest on each and every purchased account in accordance with the tenor of each such account, together with all attorney's fees and expenses incurred by the Credit Company in collecting or attempting to collect any such account, or any part thereof, and this guaranty shall particularly, but not exclusively, include an undertaking on the part of the Dealer (a) that the amount owing on each such account is correctly stated as the net amount due thereon; (b) that deliveries of the articles out of which such account arose have in each case been made; (c) that in no case is the net amount stated on such account as due by the debtor disputed, past due or subject to any contra-account, set-off or counter-claim; and (d) that the debtor named in each such account is solvent. This guaranty on the Dealer's part shall not be affected by any extension of the time of payment of any such account which may be given or granted by the Credit Company, nor by any action or omission of the Credit Company in respect of the collection of any such account; nor shall the Credit Company be required to give notice to the Dealer of default in the payment of any such account. For the purposes of this guaranty, the whole amount of any such account, with all interest accrued thereon and all attorney's fees and expenses incurred by the Credit Company in collecting or attempting to collect the same, or any part thereof, shall, at the option of the Credit Company, be deemed to be due and payable if and when default shall be made in the payment of any part of such account. In order to assure to the Credit Company the performance of the obligations herein assumed on the part of the Dealer, the Dealer agrees that upon notice from the Credit Company that default has been made in the payment, in whole or in part, of any such account, the Dealer will forthwith pay to the Credit Company the full unpaid balance of such account, with interest thereon, in accordance with the terms of such account, to the date of such payment, and all such attorneys' fees and expenses.

"5. As a guaranty fund to assure the performance by the Dealer of the obligations contained in the preceding paragraph of this agreement, the Dealer agrees at all times to keep on deposit with the Credit Company such sums of money as may be from time to time mutually agreed upon. The Credit Company shall have the right from time to time to apply these sums so on deposit in such guaranty fund towards the satisfaction of the obligations of the Dealer under the provisions of the preceding paragraph (4) and/or under any other provisions in this agreement. If at any time the amount held in such guaranty fund exceeds the amount required to be deposited therein, as so agreed, the excess shall be payable to the Dealer on demand."

The due and prompt performance by the defendant Rea of his obligations on this contract was guaranteed by defendant Bracewell to the extent of $1,000, by an indorsement on said contract.

The petition further alleges that a number of accounts and notes, which are described in several exhibits to the petition, were sold and assigned to plaintiff by the defendant Rea under the terms of the contract above set out; that plaintiff is not informed what amount the defendant Rea has collected on said accounts and notes, and said defendant has failed and refused to render plaintiff an accounting therefor. "That all of the accounts shown on said 'Exhibit B' have become worthless and uncollectible, or have been paid out by the original debtors to the defendant Rea, and not accounted for by the said Rea to plaintiff, and by reason of the fact that each and all of said accounts listed on 'Exhibit B' have become valueless, and that no further collections can be made upon the same, and that all of the same have become in default and have been declared by plaintiff to be entirely due and payable and are worthless, plaintiff has sustained a loss in the amount of One Thousand Six Hundred Eighty-three and 94/100 Dollars ($1,683.94) principal, together with interest thereon from and after the 1st day of November, 1930, as provided by law."

The petition asks for recovery of other amounts alleged to be due upon other accounts and notes which had been sold by Rea to plaintiff under the contract before set out; the whole amount claimed, including attorney's fees, being as before stated the sum of $2,500.

Each of defendants answered by a general demurrer, and a special exception on the ground that plaintiff's petition fails to allege facts sufficient to entitle it to maintain this suit against him without making the makers of the notes, and those primarily responsible for the accounts, parties to the suit.

The defendant Bracewell further excepted to the petition on the ground that it fails to allege a compliance by plaintiff with the provisions of the contract requiring plaintiff to set up a 15 per cent. reserve fund out of the amounts received by it from collections made on said accounts and notes to be returned to defendant Rea in event the notes and accounts were collected in full. Defendant Bracewell further pleaded: "That under the terms of the contract as above set forth, it was clearly understood (by plaintiff and this defendant) both expressly and by fair implication that outright sales were to be the course of dealings between the parties and that the said Rea should only be secondarily liable on such accounts as plaintiff might purchase and that said plaintiff would take such accounts and use ordinary prudence and diligence toward collecting the same and would keep true and accurate records in regard thereto and that should any liability occur to this defendant by reason of the execution of such guaranty that he would be in all things subrogated to the rights, powers and privileges of plaintiff and said Rea in and to said contract, and it was at no time contemplated in said contract that the said Rea should reserve any interest in said obligations or make direct loans or other obligations than that of the secondary liability of the said Rea upon such accounts as might be so purchased; that unknown to this defendant, said contract was in truth and in fact entered into and intended between the parties to conceal their real intention and with the purpose to violate the usury laws of this state, or if such be not the case, said contract was wholly abandoned by said parties prior to any course of dealings between them, as shown by their subsequent dealings thereunder."

In addition to his general demurrer and special exception above stated, the defendant Rea answered by general denial and the following special plea and cross-action:

"And becoming actor and cross-plaintiff herein, complaining of plaintiff, Commercial Securities Company, this defendant would show to the court that as alleged in plaintiff's petition he made and entered into the contract attached thereto; that subsequent to entering into said contract, he endorsed and delivered to plaintiff approximately ninety sales contracts for radios, as more fully set forth in subdivisions 6 and 8 of the First Amended Answer of J. S. Bracewell, defendant herein, which are here adopted and made a part hereof, and by virtue of the delivery of said contracts, plaintiff made certain advances to this defendant by way of loans and charged interest therefor as fully set forth in said answer; that this defendant less than two years prior hereto, the exact date of which is unknown to defendant but well known to plaintiff, paid to plaintiff the amount of interest therein set forth, aggregating the sum of $750; that said interest aggregated more than ten per cent per annum and constituted usury under the Constitution and laws of this state, whereby plaintiff became liable and bound to pay to this defendant by virtue thereof the sum of $1500 for which this defendant prosecutes his cross-action; that of the balance so sought to be charged against this defendant in plaintiff's said petition on schedules 14 to 17, fully set forth in said answer, the sum of $267.11 is a usurious interest charge which this defendant is in no way liable, bound or obligated to pay.

"Wherefore, this defendant prays that the plaintiff take nothing by its suit, and that it be cited to appear and answer this cross-action and upon hearing hereof, this defendant be given judgment over against plaintiff in the sum of $1500 and for costs of suit, and for such other and further relief as he may be entitled to receive."

The trial in the court below without a jury resulted in judgment in favor of the defendants. This judgment contains these recitals:

"And no jury having been demanded, the parties submitted the matters of fact as well as of law to the court, and the court having heard the pleadings, evidence and argument of counsel took said cause under consideration, and on this day finds that plaintiff's claim against defendant, Rea, is founded upon direct loans at usurious rates of interest, the defendant, Rea, being due and owing to plaintiff by reason thereof the sum of $1315.-

40, and that defendant Rea, has paid usurious interest to plaintiff under schedules 1 to 14, as fully set forth in the pleadings, in the sum of $778.57, and by reason thereof has a lawful liquidated demand against plaintiff for penalty in the sum of $1500.00 and therefore entitled to recover judgment over and above plaintiff's cause of action in the sum of $184.60, together with all costs in this behalf expended;

"It is therefore ordered, adjudged and decreed by the court that defendant, G. M. Rea, do have and recover of and from the Commercial Securities Company, plaintiff, the sum of One Hundred Eighty-four and 60/100 Dollars ($184.60), together with all costs in this behalf expended, for which he may have his execution; and that said plaintiff take nothing as to the defendant, J. S. Bracewell, and that he go hence with his costs; to which judgment of the court plaintiff and defendant Rea, then and there excepted and gave notice of appeal to the Court of Civil Appeals for the First Supreme Judicial District at Galveston, Texas."

There was no request for other or further conclusions of fact and law.

The evidence is, we think, sufficient to support the facts recited by the trial judge in the judgment. Upon the facts so found no other judgment could have been properly rendered. Appellant concedes that if the contract was usurious the judgment is correct.

All of the propositions presented in appellant's brief are based upon the general rule of law, which seems to be supported by the weight of authority, that negotiable instruments, assignable accounts, or contracts for the purchase of goods, wares, and merchandise, may be transferred and bought as freely as any other property, and the rate of discount is a matter of agreement between the buyer and seller, and the guaranty by the seller of the payment in full of the face of the note or account will not of itself bring the sale within the letter or spirit of our usury laws; such sale and guaranty being regarded as a valid sale of a chattel with warranty of its soundness.

Upon the facts disclosed by the record, we do not think this case should be held governed by the rule above stated.

In the course of dealings between the appellant and Rea under this contract, neither of the parties seemed to have regarded the transferred accounts as belonging to appellant. Whenever Rea needed money in the conduct of his business, he made a list of accounts and contracts held by him with purchasers of his radio goods, on which he made a written assignment and transfer to appellant. In such written transfer he guaranteed the correctness of the accounts as stated in the list, and their payment in full, and indorsed any notes that might be included in the list.

Upon delivery of such assigned list, Rea received from appellant the amount of the accounts and notes less the discount and service charges stated in the assigned list, and the 15 per cent. reserve fund provided in the contract. The original notes, accounts, and contracts were held by Rea and collected by him. Appellant at no time treated the makers of such notes and contracts as its debtors, required no statement from Rea as to collections made by him on the notes, accounts, and contracts so assigned, but required that the face amount of the accounts and the service charges, less the 15 per cent. reserve before mentioned, be paid to it by Rea in accordance with the several contracts between Rea and the makers of the original notes, accounts, and contracts. To illustrate the character of these transactions, No. 7 of the numerous transferred lists or schedules of accounts and contracts upon which appellant's suit is based, shows that the total amount due on the principal of the five accounts which were transferred to appellant by Rea on August 19, 1929, was $742.40. The 15 per cent. reserve fund, which the contract of transfer provided should be set up and kept by appellant, reduced this amount to $631.04. The service charges made by appellant were $65.59. The amount advanced Rea on the accounts and contracts was $565.45. Four of these five accounts were payable in twelve months in installments, ranging with the amount of the accounts from $10 to $11.50 per month. The fifth account was payable in ten months at $12.32 per month.

Mr. Ferrell, the agent of appellant in all these fourteen or more transactions with Rea, testified in substance that all of the transfers and assignments on which plaintiff's suit is based were similar in form and substance to that shown in list No. 7.

The evidence further shows that Rea at any time after obtaining the money advanced to him under any of these transfers could, by paying the full amount of the face value of the accounts, notes, and contracts of purchase, and the service charges set out in the list or schedule transferred by him, be relieved of further liability under his contract of assignment and have his contracts of assignments or transfers so paid returned to him. Under the original contract, the 15 per

cent. reserve was to be retained by appellant to cover any costs or expenses it might have to incur in the collection of the amounts due it under any of the contracts of assignments made under the original contract.

. . There is no evidence that appellant ever incurred any expense in the collection of any of the accounts transferred to it by Rea which were paid in full by him.

■ Upon this state of the evidence the trial court was fully justified in concluding that the contract as understood and acted upon by the parties thereto was not a bona fide sale of the chattels described therein, but that such apparent sale was only a subterfuge adopted by the parties to cloak or hide their real intention to contract for the payment of usurious interest.

. . ■ The mere use of words in a contract which, standing by themselves, are capable of only one meaning cannot, when the contract considered as a whole shows ambiguity in its meaning, prevent the introduction of parol evidence to show the understanding and construction placed upon the contract by the parties thereto. In re Grand Union Company (C. C. A.) 219 F. 353; Home Bond Company v. McChesney, 239 U. S. 568, 36 S. Ct. 170, 60 L. Ed. 444.

■ If it could be held that the original contract on its face was so plain and unambiguous as not to admit of parol evidence to change its expressed meaning, the parties themselves changed the original contract by their subsequent written contracts of transfer and assignments made thereunder, and their dealings under these contracts. People's Building & Savings Ass'n v. Keller, 20 Tex. Civ. App. 616, 50 S. W. 183; Cotton States Co. v. Reily (Tex. Civ. App.) 50 S. W. 961; Peightal v. Cotton States Bldg. Co., 25 Tex. Civ. App. 390, 61 S. W. 428; Interstate Savings & Trust Co. v. Hornsby (Tex. Civ. App.) 146 S. W. 960.

■ We think the rule announced by this court in the case of Independent Lumber Company v. Gulf State Bank, 299 S. W. 939, is controlling on the facts of this case. Parties cannot by entering into a form of contract valid and free from the taint of usury on its face under the cloak of such form violate our usury law without incurring its penalty.

■ We do not think there can be any doubt of the correctness of the judgment of the trial court in favor of the defendant Bracewell, because of the failure of appellant to collect and hold the 15 per cent. service fund provided in each of the contracts sued on which were guaranteed by Bracewell.

The judgment of the trial court should be affirmed, and it has been so ordered.

Affirmed.